Filed 12/9/25  P.W. v. Superior Court CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| P.W.,<br><br>    Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF<br>SAN BERNARDINO COUNTY,<br><br>    Respondent;<br><br>SAN BERNARDINO COUNTY<br>CHILDREN AND FAMILY SERVICES,<br><br>    Real Party in Interest. | E086905<br><br>(Super.Ct.No. J301377)<br><br>OPINION |

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Lynn M. Poncin, Judge.  Petition denied.

Clark & Le, and Ladda Arceneaux for Petitioner.

No appearance for Respondent.

Laura Feingold, County Counsel, and Kristina M. Robb, Deputy County Counsel, for Real Party in Interest.

1

Presumed father Paul W. (father) petitions for extraordinary relief pursuant to rule 8.452 of the California Rules of Court seeking to set aside the orders of the San Bernardino County juvenile court terminating family reunification services at the 12-month review hearing and setting a Welfare and Institutions Code section 366.26 hearing on the grounds he was not provided with reasonable services.[1]  We will deny the petition.

## FACTUAL AND PROCEDURAL BACKGROUND

Mary E. (mother) and father are the parents of S.W. (the child) who came to the attention of respondent San Bernardino County Department of Children and Family Services (Department) after she was born and placed in the neonatal intensive care unit (NICU) because she was suffering from tremors and irritability due to withdrawal from psychiatric medication.

Investigation by the Department revealed that mother was unable to stop taking her medication during pregnancy because she suffered from schizophrenia and schizoaffective disorder and bipolar disorder.  Father was reported to have extreme anxiety and a traumatic brain injury.  The parents argued loudly while in the hospital and the child's crying caused her heart rate to be elevated for long periods of time and mother was not tending to her.  It became clear before the child was discharged that the parents were not capable of caring for her.  The Department made efforts to collaborate with the family and their neighbor to create a support network before the child left the hospital.

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise noted.  All references to rules are to the California Rules of Court.

A. *Detention*

Two of the Department's supervising social workers paid a follow-up visit to the parents' home the same day the child was discharged. The social workers learned the neighbor had never entered the parents' home before that day, the neighbor was not willing to stay with the parents, but she could visit twice a day or more if necessary, and she would only be able to help for a couple of months. Mother was unable to hold the child correctly and was not supporting the child's head, the child was still shaking involuntarily because of in utero exposure to mother's medication, both parents ignored the child when she was crying, and the social worker had to suggest to them that the child might be hungry and was due for a feeding.

One of the social workers obtained a warrant, took the three-week-old child into protective custody, and filed a juvenile dependency petition alleging the child came within section 300, subdivision (b)(1) because her parents were unable to care for her due to their developmental disabilities and mental illness.

At the detention hearing, the court ordered the child detained and directed the Department to provide the parents with predisposition services. The parents were to have supervised two-hour visits with the child at least twice a week.

B. *Jurisdiction and Disposition*

The Department's report on jurisdiction and disposition included results of the social worker's interview with the parents. Mother described a long history of mental health issues, beginning with a diagnosis of schizophrenia at age 17, and current

diagnoses of schizoaffective, bipolar, a social anxiety disorders for which she takes medication. Mother was also developmentally delayed and had a caretaker who helped clean, cook and care for her.

Father denied having a history of mental illness. He had suffered a brain injury after being hit by a car when he was a high school freshman and was thereafter misdiagnosed many times with PTSD, schizophrenia, bipolar, and paranoia schizophrenia, and put on various medications including Lithium, Depakote, Thorazine, Phenobarbital, and Abilify. He had not been taking any medication for the past 15 to 20 years because he does not believe he needs them. He had been taken into custody under section 5150 (which authorizes involuntary detention when probable cause to believe a person is a danger to themselves or others) at least five times, with the last time occurring in 2004. He was willing to engage in mental health treatment and would submit to a psychological examination if a therapist deemed it necessary.

The mother was living in an apartment obtained through "StepUp" due to her mental health diagnosis and developmental disability. Father, who was married to mother and was receiving SSI (Supplemental Security Income), was alternating between living with mother and being transient.

At the commencement of the combined hearings on jurisdiction and disposition in July 2024, the juvenile court granted the parties' request to refer the case to mediation to resolve issues concerning the allegations and case plan.

Mediation resulted in agreements with respect to family reunification services. Father's services included "individual counseling, parenting, and psychological evaluation (follow recommendations made by professional)." The parties also agreed to (i) strike the dependency petition's allegation that father has a mental disability which negatively affects his ability to provide adequate care for the child, and (ii) to amend the allegation that he has a history of "mental health illness" which negatively affects his ability to care for the child to say he has "a history of mental health diagnosis, if left untreated, places the child at risk."

By the time the jurisdiction/disposition hearing resumed in September 2024, the child had been placed in the home of a nonrelative extended family member, Ms. H. At the hearing, juvenile court sustained the petition as amended and adjudged the child a dependent of the court. It removed the child from parental custody and ordered the family reunification services as agreed upon in mediation and as set forth in the Department's jurisdiction/disposition report. The court again ordered twice weekly, two-hour supervised visits between the parents and the child.

C. *The Six-Month Review Hearing Results in Continuation of Services*

In her February 2025 report prepared for the March 2025 six-month review hearing, the social worker reported the parents had separated but were working on their marriage.

Both parents had completed eight counseling sessions and a 12-session parenting course by the end of November 2024. The reports from father's counseling session and

parenting classes stated that father attended and actively participated in all sessions and classes, and each concluded that father's prognosis for caring for the child was positive so long as he continued to utilize the skills he learned in therapy and in class. The therapist mentioned that father said his living situation and communication with mother was causing him a significant amount of stress and anxiety. The evaluations of mother's counselor and parenting class provider concluded that, although mother was an active participant in her sessions and classes, she could not care for the child on her own.

The social worker reported that she had not been able to submit referrals for psychological evaluations for the parents because the juvenile court had not authorized that service at the jurisdiction/disposition hearing. She planned to request that authority at the next hearing.

In the period leading up to the six-month hearing father had cancelled 50 percent of his scheduled visits because of health problems or anxiety attacks that kept him homebound. In February 2025, the visits, which had been scheduled for two hours twice a week since the child was detained in July 2024, were changed to once a week, four-hour visits to accommodate the child's schedule. By then the child had been diagnosed with delays in receptive communication, adaptive/self-help, as well as in cognitive and gross motor skills, and was a client of the Inland Regional Center. The caregiver reported that the child was struggling with sucking during feeding and stiffness in her legs. In January 2025 the Department referred her to occupational and physical therapy for feeding concerns, mixed motor concerns, and developmental delays.

Visitation took place at one of the Department's offices and was supervised by the child's caretaker who reported that the parents were very anxious during visits and needed constant redirection, assistance and guidance with the child. The parents argued during visits. On February 14 and 19, 2024, the child cried for 30 minutes and, when the parents could not soothe her, they left. Father repeated numerous times that the child's crying made him very anxious and nervous. Father did not spend a lot of time engaging with the child during some visits but instead focused on mother.

The social worker stated that, beginning February 25, 2025, the child's clinician from the community services support center would start spending an hour at each visit to give support to the family.

At the March 2024 review hearing, the juvenile court found by clear and convincing evidence that reasonable services had been provided to the parents, that the parents had made significant progress in resolving the issues that led to the child's removal, and that they demonstrated the capacity to complete the treatment plan objectives and provide for the child's safety, well-being, and special needs. It ordered continuation of services and ordered the psychological evaluation for both parents as well as parent child interactive therapy. Neither the Department's recommendations nor the court's order included the family support services of the child's clinician. Supervised visits between the parents and the child were reduced to a minimum of once a week for two hours per visit over the parents' objections.

The parents did not appeal the juvenile court's findings and orders.

D. *The 12-Month Review Hearing Results in Termination of Services*

In her report prepared on August 5, 2025, in anticipation of the August 29th 12-month review hearing, the social worker noted that the parents had stopped seeing one another and father said his mental health had since become more stable.

The child, who started receiving occupational and physical therapy to address her developmental delays as well as her feeding and mixed motor concerns after her assessment was completed in January 2025, had shown improvement in all developmental domains by June 2025.

The parents were provided eight sessions of conjoint therapy to address the issues in their relationship, which they completed.  The therapist reported ongoing problems with the parents' ability to communicate and their tendency to interrupt one another. Additional sessions were recommended but mother refused to participate, so the therapy was discontinued.

The psychological evaluations of the parents were not completed until July 23, 2025.  The psychologist, Dr. Carlyn Werderman, concluded that, although father appeared to have made significant progress, his anxiety and panic still seemed to negatively impact his parenting capacity.  Her recommendations included (i) further assessment to determine if father had suffered a traumatic brain injury, (ii) having father complete a cognitive evaluation, (iii) providing him with individual counseling over a long period of time to address his anxiety issues with an eye toward eventual reunification, and (iv) that

he continue with and use a stepwise progression in titrating therapy as he progressed in visitation and reunification time.

The parent-child interactive therapy (PCIT) ordered at the March 4, 2025, six-month review hearing began on June 10, 2025. The therapist reported that, at the first session, the parents had difficulty communicating effectively, father appeared uneasy while holding the baby, and the parents almost dropped the child. The therapist recommended having the parents practice with a doll before working directly with the child.

In July 2025, the social worker arranged separate PCIT sessions for the parents at their request. Mother failed to attend her one-on-one sessions and the therapy was terminated as to her on August 8, 2025. On August 26, 2025, the therapist informed the social worker that she had been providing individual therapy services for father to address his anxiety, and he demonstrated the ability to manage the problem using coping skills.

Separate visits for the parents with the child were also arranged in July 2025 because mother's behaviors during visits reflected an "elevated state of mind." Not only was mother engaging in argumentative behavior with father, but she was also acting out in other ways. During a visit in April 2025, she overfed the child and purposely crashed the child's stroller into the wall to wake the child up after she had fallen asleep and then repeated that method of waking the child again in July. In May, mother needed to be redirected several times because she was continually trying to hold the child by the neck

9

and, at another visit, mother arrived smelling strongly of urine. In June, the parents' visit was terminated early because mother became verbally assaultive with the caregiver after the caregiver redirected mother several times to prevent mother from roughly putting toys in front of the child's face, causing her to cry.

Father began to attend visits consistently after the parents started seeing the child separately in July 2025. He explained that, once he was able to visit without mother, he could be more present for the child, that he no longer felt anxious and was able to listen when being redirected. After a visit on July 18, 2025, the caregivers reported father listened well to redirection by the caregivers and that he let the child lead the visit, but he became quickly overwhelmed when the child cried and would hand the child back to the caregivers. They also reported that father was easily distracted during the visit, he was unable to change the child's diaper, and he brought a blanket to the visit that smelled strongly of cat urine.

By the time father testified on his own behalf at the September 11, 2025, contested 12-month review hearing, his visits were supervised by a monitor from an agency. The monitor did not participate in the visit but simply sat in the doorway. Father agreed he had very little experience changing diapers and needed more practice. As to his bringing a smelly blanket to a visit, he explained he grabbed the wrong blanket because he was in a rush. After making that mistake, he adopted a practice of preparing for visits the night before, putting together a blanket, books, toys, and snacks so that everything would be ready to go for the next day.

10

No one had discussed the results of father's psychological examination with him and his only knowledge of its contents was what was presented in the social worker's report. Father was willing to do whatever therapy he was asked to engage in and to take any medication prescribed for him unless he had an adverse reaction to it. The child's counsel asked father about his ability to see, eliciting testimony that he had very little vision in one eye, that he did not have a driver's license and instead depended on the bus, family and friends, and Uber.

The social worker also testified. She identified father's anxiety as his mental health issue and acknowledged the Department had been aware of his anxiety "at least since jurisdiction." The social worker did not feel safe allowing father to have unsupervised visits because of her concerns about his cognitive intellectual issues but had not referred him for services to address those problems. Father had not been provided with a parenting partner.

The social worker also explained that the Department did not obtain the juvenile court's authorization for the psychological evaluations until the March 4, 2025, six-month review hearing because the social worker who prepared the findings and orders for jurisdiction and disposition did not phrase that component in the form of an order. When father's counsel asked the social worker to explain what stepwise progression titrating therapy is, she testified she had never heard of it and acknowledged that she did not know the evaluator had recommended it for father. She admitted that, when she received the

11

evaluations, she only "skimmed" them and "did not read them word for word" because they were received at the "last minute when [she] had to write the court report."

At the close of evidence, the juvenile court found by clear and convincing evidence that reasonable services had been provided but that the parents did not fully engage in those services because they were more focused on the relationship between each other rather than on the relationship between themselves and the child. The court specifically noted that father did not visit the child consistently and focus on her until July 2025 when he was no longer in a relationship with mother.

The court also denied the parents' request to continue services, explaining that the 18-month limit on services would fall on December 30, 2025, less than four months into the future, and it could not find a substantial probability of return of the child to either parent by then. The court terminated reunification services and set the matter for a section 366.26 hearing.

## DISCUSSION

In his petition for an extraordinary writ, father seeks orders directing the juvenile court to vacate its order setting the section 366.26 hearing and to provide further reunification services for him.[2] He argues he is entitled to relief because he was not provided reasonable reunification services. We disagree.

---

[2] Father's petition also requests this court to order the juvenile court to conduct a hearing pursuant to section 16506 (a provision authorizing family maintenance services) but he makes no argument in support of that request.

12

Where, as here, the juvenile court has ordered family reunification services, the Department must make a good faith effort to develop and implement a family reunification plan.  (*In re T.G.* (2010) 188 Cal.App.4th 687, 697.)  The record should reflect that the Department identified the problems leading to the loss of custody, offered services designed to remedy those problems that are appropriately based on a family's unique facts, maintained reasonable contact with the parent during the course of the service plan, and made reasonable efforts to assist the parent in areas where compliance proved difficult.  (*Id.*, at pp. 696–697.)  The reasonableness of services is not judged by whether they were the best that might be provided in an ideal world, but whether they were reasonable in the circumstances.  (*Id.*, at p. 697.)  The applicable standard of review is sufficiency of the evidence.  (*Ibid*.)

The lion's share of father's claim that he did not receive reasonable services is centered on the services provided during the first six months of the reunification period. For example, he argues that, although the individual therapy he completed in October 2024 addressed inappropriate parenting techniques and assuming responsibility over the actions that led to removal of the child, it did not mention how his anxiety affected his ability to care for the child.  He posits that his reunification plan should have focused on his mental health issues and on making special accommodations such as referring him to parenting classes for young children or for parents with disabilities, or dealing with children with developmental delays.  Father notes, too, that the Department's report for

the six-month review detailed concerns regarding his parenting skills but he was never provided additional services to address those issues.

At the March 4, 2025, six-month review hearing, the juvenile court found that father had been offered and provided reasonable reunification services. Father did not appeal from the findings and orders made at that hearing, and the time for challenging them has long since passed. (Rule 8.406(a)(1) ["a notice of appeal must be filed within 60 days after the rendition of the judgment or the making of the order being appealed"]; *In re S.B.* (2009) 46 Cal.4th 529, 532.)

Father complains that the PCIT sessions were supposed to focus on parenting but after a few sessions, it became another round of individual therapy to assist him with his anxiety. His complaint overlooks that the objective of the therapy was to reduce anxiety as well as increase the parents' confidence in their parenting abilities. Moreover, it was not the quality of the services that caused the parents difficulty in receiving and benefitting from that therapy but rather it was their continued focus on their differences during sessions. When the parents requested separate sessions, the social worker and the therapist accommodated them, and the social worker provided a new referral. Mother never resumed that service. Father began to benefit from the sessions when he began receiving the individual therapy services.

Father posits that the social worker failed to have the psychological evaluation "done" until June 2025, leaving him with too little time to meaningfully utilize the strategies that the psychologist recommended. It is true that, because the evaluation was

not completed until June, father was not left with much time in the reunification period to implement the psychologist's recommendations.

Contrary to the suggestion in father's petition, however, the fact that the evaluation was received just a couple of months before the 12-month review hearing does not inexorably lead to a conclusion that the services offered by the Department were unreasonable. It is apparent that the social worker arranged for the assessment soon after it was ordered at the March 2025 six-month hearing because Dr. Werderman had started her evaluation by April 16, 2025.

Moreover, even if the assessment had been completed on the same day it was ordered by the juvenile court, it is extremely unlikely that father would be able complete the recommended therapies before the end of the statutory limit for provision of reunification services. The doctor highly recommended that individual therapy occur on a long-term basis to permit father to develop and maintain the skills to cope with his anxiety and stress. Thorough and successful preparation was vital in view of the typical stressors that come with parenting in general, compounded in father's case by being a single first-time parent—stressors that could exacerbate the medical and psychiatric challenges father was already experiencing. If father progressed with his visitation time and reunification plan, the therapist strongly recommended that he continue with and use a stepwise progression in titrating therapy as his visitation with the child increased to prevent a regression and to provide opportunity to troubleshoot any challenges he might have.

Father complains that the social worker only skimmed his evaluation and had not read the plan for father's therapy before making her recommendations to the juvenile court. Though we certainly do not condone the social worker's failure to properly review the report, her lack of knowledge about the details of the therapeutic plan proposed by Dr. Werderman does not change our conclusion that the record supports the juvenile court's finding by clear and convincing evidence that the Department offered and provided reasonable reunification services to father.

## DISPOSITION

The petition for extraordinary writ is denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ\
                                               P. J.

We concur:

FIELDS\
                  J.\
MENETREZ\
                  J.